IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| **NORTH SHORE PEDIATRICS, INC.,** ) <br> ) <br> **and** ) <br> ) <br> **PEDIATRICS OF KEMPSVILLE, PC,** ) <br> ) <br> Plaintiffs**,** ) <br> ) <br> **V.** ) <br> ) <br> **HEALTH NET FEDERAL SERVICES, LLC,** ) <br> ) <br> Defendant. ) <br> ) | **CIVIL ACTION NO. 2:21-CV-336** |

## COMPLAINT

NOW COME the Plaintiffs, North Shore Pediatrics, Inc. ("North Shore") and Pediatrics of Kempsville, PC ("Kempsville") (collectively, "Plaintiffs"), by counsel, and for their Complaint against the Defendant, Health Net Federal Services, LLC ("Health Net"), state as follows:

### The Parties

1. North Shore is a Virginia corporation with a principal office in Norfolk, VA.

2. Kempsville is a Virginia professional corporation with a principal office in Virginia Beach, VA.

3. Defendant Health Net is a California limited liability company with its principal office in Rancho Cordova, CA.

### Jurisdiction

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity and the amount in controversy, excluding interest and costs, exceeds $75,000.

## Venue

5. Venue is proper in this Court because, among other reasons, a substantial part of the events or omissions giving rise to the claim occurred in Norfolk, Virginia.

## Facts

6. The Plaintiffs are practicing pediatricians in the Hampton Roads area of Virginia.

7. Among other things, the Plaintiffs administer vaccines to the area's military families.

8. The Plaintiffs are also members of the Children's Health Network ("CHN").

9. Health Net is a contractor for the United States Department of Defense Tricare Program who, during all relevant times, was responsible for paying insurance claims to providers treating Tricare beneficiaries in the "Tricare North Region," which, at the relevant time, included Virginia.

10. CHN and Health Net are both parties to the Professional Provider Agreement (the "Agreement"). The Agreement is attached hereto as **Exhibit A**.

11. Section 1.13 of the Agreement contemplated that CHN, as a "Provider" that is not a natural person, would use group providers to provide the covered services of the Agreement to its beneficiaries.

12. Plaintiffs, through their separate contracts with CHN, were considered group providers under the Agreement and were therefore assignees of certain duties and rights of the Agreement.

13. Section 2.3 of the Agreement specifically explains and discusses the duties and

rights of group providers as assignees of the Agreement.

14. The separate contracts between Plaintiffs and CHN are attached hereto as **Exhibits B** and **C**.

15. Pursuant to the Agreement, as practicing pediatricians in the "Tricare North Region," Plaintiffs submitted all of their Tricare-covered claims directly to Health Net for reimbursement, including reimbursements for administered vaccines (the "Claims").

16. When seeking reimbursement, Plaintiffs were instructed to submit their Claims to Health Net on a "by unit" basis.

17. For vaccines, one unit was used to represent one full dose of the designated vaccine.

18. The volume of each vaccine contained in a particular dosage varied, depending upon the particular vaccine. For example, the volume for one unit of Proquad is .5ml.

19. A Claim submitted by Plaintiffs to Health Net for reimbursement would reflect the number of units provided, not the volume of the unit.

20. Anything less than one unit on a Claim would signify that less than the full dosage had been given, which would be unusual, if not improper, because providers are ordinarily supposed to give the full, required dosage of a vaccine. For example, .5 units of Proquad would indicate that .25ml had been administered.

21. In this case, when the Plaintiffs submitted Claims to Health Net that showed "1 unit" of a given vaccine had been administered, the return form from Health Net showed the unit amounts populated with ".5 units," incorrectly indicating that only half of the vaccine had been administered.

22. Attached as **Exhibit D** is an example "Claim Form" submitted by North Shore to

3

Health Net showing vaccines with a "1" in the unit box. Additionally, attached as **Exhibit E** is Health Net's return sheet showing the same vaccines with ".5" in the unit box rather than "1."

23. In these instances, the Plaintiffs were paid in accordance with the ".5" value, and, as a result, the Plaintiffs received less than the full amount they were owed for the Claims.

24. This was improper because the Plaintiffs always administered the full dosage of each vaccine, and thereby were entitled to be reimbursed for the full amount.

25. Additionally, there is no reason that this unit number submitted by the Plaintiffs should have been changed during the payment processing other than as the result of Health Net's improper conduct to avoid giving the Plaintiffs the correct reimbursement.

26. Though this payment "error" occurred fairly consistently, it primarily occurred on some of the most expense vaccines. For example, out of the seventeen (17) vaccine types for which the Plaintiffs typically submitted Claims, only six (6) of the more expensive vaccines submitted were reimbursed incorrectly on a large scale, suggesting a deliberate and intentional targeting effort on the system by Health Net.

27. In this case, the six at-issue vaccines that were improperly reimbursed by Health Net (the "At-Issue Claims") and their required dosages are as follows:

   a. Rotateq (CPT code #90680); dosage: 2ml to be taken orally

   b. MMRII (CPT code #90707); dosage: .5ml to be given subcutaneously

   c. Pentacel (CPT code #90698); dosage: .5ml series to be given subcutaneously

   d. Acthib (CPT code #90648); dosage: .5ml series to be given subcutaneously

   e. Proquad (CPT code #90710); dosage: .5ml series to be given subcutaneously

   f. Varivax (CPT code #90716); dosage: .5ml series to be given subcutaneously

28. Thus, with the exception of Rotateq, for each of the At-Issue Claims, one unit

represented the administration of a .5ml dosage. For Rotateq, one unit represented the administration of a 2ml dosage.

29. Additionally, the process for filing a Claim requires navigating a complicated payment system, involving third-party entities. The complexity of this payment process enabled Health Net to hide its illicit activities from the Plaintiffs for many years.

30. Because of the high frequency at which doctors like the Plaintiffs filed Claims with Health Net, because many Claims included numerous other services from each doctor's visit beyond just vaccine administration, because the timing of request for payment and actual payment is significantly disjointed and blended with other payments, and because Health Net did not have to reconcile payment amounts directly with the Plaintiffs, Health Net was able to conceal the lack of payment from the Plaintiffs.

31. Therefore, even though Health Net technically provided a form showing how each of the At-Issue Claims were paid out, Health New knew that it would be nearly impossible for Plaintiffs to manually reconcile each individual transaction and discovery the pattern of non-payment.

32. Upon information and belief, Health Net did this intentionally and deliberately to methodically steal funds from Plaintiffs in a covert way so that it could not be easily discovered.

33. Upon information and belief, North Shore and Kempsville are not the only victims of Health Net.

34. When North Shore discovered the discrepancy on or about June of 2017, it brought the issues to Health Net's attention through representatives of North Shore's electronic medical record ("EMR") provider, Athena, and its Health Network Contract Manager at CHN.

35. Health Net's response through a customer service representative, each time, was

to make assurances that this problem was "Tricare's error" and that North Shore "would be reimbursed for the underpayments."

36. In a conversation between Health Net and CHN on or about March 2, 2018, Health Net promised to reimburse North Shore for their past five years of underpayments.

37. Health Net subsequently did make those reimbursements.

38. However, Health Net later reneged on its agreement to reimburse North Shore, despite the fact that the reimbursements had already been completed, arbitrarily deciding that five years of reimbursement was too high.

39. Instead, Health Net decided it would only reimburse North Shore for the past two years.

40. As a result, Health Net began to wrongfully, and without permission, withhold legitimate reimbursements from North Shore, reimbursements that were unrelated to the original bad acts by Health Net, in an effort to recoup the three years of repayment which had already been made to North Shore.

41. Additionally, after wrongfully recouping the three years of repayment previously made to North Shore, Health Net continued to withhold payments from North Shore until it was able to "recoup" the underpayments for the remaining two years.

42. Thus, by the end, all five years' worth of reimbursements that had been paid out to North Shore were retroactively taken back by Health Net.

43. Health Net justified this improper self-help by stating that North Shore was overpaid because "[the] claim [was] previously processed with an incorrect unit count. After updating the number of units, the revised claim paid less than the previous version."

44. While it is true that the At-Issue Claims were processed with an incorrect unit

6

count, due to Health Net's actions, the revised claim should have actually paid more than the previous version, not less.

45. Similarly, Kempsville was a victim to the same sort of theft, however unlike North Shore, Kempsville was not able to discover the theft until it was brought to its attention by representatives of North Shore around the spring of 2018.

46. Health Net's activities were hidden from Kempsville for the same reasons they were hidden from North Shore, as explained above.

47. Upon reviewing its billing and other relevant documentation, Kempsville discovered that it too has been under reimbursed.

## COUNT I
## BREACH OF CONTRACT

48. Plaintiffs repeat and re-allege the paragraphs above as if fully set forth herein.

49. Health Net and CHN are parties to the Agreement.

50. Plaintiffs are considered "group providers" under the Agreement through their contracts with CHN and are therefore assignees thereto.

51. Pursuant to such assignment, Health Net had payment obligations to the Plaintiffs for the covered services provided by Plaintiffs to Tricare beneficiaries.

52. Specifically, Section 4.1 of the Agreement provided that "HNFS shall make payment on each of Provider's complete, accurate and timely Retained Claims for Covered Services rendered to a Beneficiary within thirty (30) days of receipt of each such claim."

53. As mentioned above, Health Net only paid a portion, usually about half, of what they owed for the At-Issue Claims by paying Plaintiffs for the administration of .5 units of a vaccine, or half of the vaccine, instead of 1 full unit, as was administered by the Plaintiffs and subsequently requested on their At-Issue Claim submissions, and thereby Health Net breached

the Agreement.

54. Health Net, admitting it was at fault for improper billing and payments, reimbursed North Shore for five years of payments.

55. Health Net, among other things, later denied proper reimbursement to North Shore and withheld payments to retroactively "fix" its own correction, thereby breaching the Agreement again.

56. Thus, Health Net breached its payment obligations to both Plaintiffs by paying out less than the correct amount for the At-Issue Claims and further breached its obligation to North Shore by wrongfully recouping its prior reimbursement to North Shore.

## COUNT II
## UNJUST ENRICHMENT
### (*in the alternative*)

57. Plaintiffs repeat and reallege the paragraphs above as if fully set forth herein.

58. Plaintiffs plead this count in the alternative to Count I above.

59. Health Net has been enriched by its retention of between one half and three-quarters of the value of each At-Issue Claim filed by the Plaintiffs as well as by its wrongful recouping of the reimbursements made to the North Shore.

60. The Plaintiffs were entitled to full reimbursement of each of their At-Issue Claims from Health Net, and North Shore was entitled to *not* have its reimbursements retroactively withheld due to Health Net's earlier admittance of its wrongful processing of certain Claims.

61. Health Net should reasonably have expected to pay Plaintiffs because of its role as a contractor on behalf of Tricare and because Plaintiffs submitted Claim forms to Health Net notifying Health Net that Plaintiffs were treating Tricare beneficiaries.

62. Health Net should have reasonably expected to reimburse North Shore due to its agreement to provide reimbursement for five years of improper Claims.

63. Without providers like the Plaintiffs submitting claims for treating Tricare beneficiaries, Health Net could not continue to provide its role as a contractor for Tricare.

WHEREFORE, in consideration of the foregoing, Plaintiffs respectfully pray that they be granted judgment against Health Net as follows: (1) direct and consequential damages in the amount of $295,000; (2) granting post-judgment interest at the statutory rate until all amounts are fully paid; and (3) such other and further relief as to the Court may seem just and equitable.

A trial by jury is demanded for all issues so triable.

Respectfully Submitted,

NORTHSHORE PEDIATRICS, LLC and
PEDIATRICS OF KEMPSVILLE, PC


By:   /s/ Christopher D. Davis
        Of Counsel

Christopher D. Davis (VSB #74809)
Destinee B. Byers (VSB #94691)
Davis Law, PLC
555 Belaire Avenue, Suite 340
Chesapeake, VA 23320
Telephone number: 757-277-6772
Fax number: 757-257-8614
chris@davislawplc.com
destinee@davislawplc.com